Good morning, ladies and gentlemen. Our next case is Sean Higgins v. Department of Veterans Affairs, 2018-2352, Mr. Witte. May it please the court, I'm John Witte with Government Accountability Project for the petitioner Sean Higgins, a hero dedicated to improving health care for America's veterans, one of the most important whistleblowers in the VA system. At a great personal cost, he's including suffering crippling and obvious PTSD. He has brought to light numerous breakdowns in health care at the VA. What is at issue here is the agency-caused PTSD as a mitigating factor. The AJ ignored this court's Malloy precedent and provided no analysis of the extensive medical evidence of PTSD. Can I ask you a question? The AJ did say it made a fact finding that there was PTSD. I believe may have even said that it was caused by these circumstances in the workplace. And then says in mitigation, I'm looking at page A25, and there's a sentence to the effect of identifying what the mitigation issues were, like specifically noted the appellant's lengthy service, his PTSD, his perception of being retaliated against for whistleblowing, and his fully successful performance ratings. However, these mitigating factors cannot overcome the extreme seriousness of the charges he sustained. Why isn't that, along with the following paragraph, not enough to show that, you know, perhaps it could have just been stated in a lot more detail and a lot more extensively. But why isn't that enough to show that in this case, the board actually considered the PTSD but determined that the seriousness of some of the remarks made outweighed the PTSD and the other mitigating factors? I mean, I don't think there's any case law that says in circumstances where there's a mental illness, that's it. You can't consider other factors. It just has to be considered, and it can be weighed. Judge Stoll, the AJ here acknowledged PTSD, and then there was no subsequent analysis or consideration of what was the likely, how big of a factor was PTSD? What was the relationship between his PTSD and the manifest conduct? And then how does the PTSD diagnosis fit in as a mitigating factor? All of that analysis was missing. The only thing the AJ alluded to about PTSD was he simply acknowledged that Mr. Higgins has PTSD. And so that is... He said it was a mitigating factor. It's included in a laundry list of mitigating factor with no further analysis. Yes, Judge Stoll. What would you think that should have... What more do you think should have been done? I mean, specifically, would it have been enough had there been a discussion of how difficult it was for Mr. Higgins to maintain his conduct or to say that, in fact, I conclude that the I find that it's outweighed. What more would have had to have been done here? I think, Judge Stoll, the AJ should have addressed the medical evidence of the PTSD to talk about its severity and perhaps to talk more about its source. And then, more importantly, connect the PTSD to the conduct and to assess the likelihood, maybe make a finding, of whether the PTSD in any way caused that conduct. But whatever the cause of the conduct, the conduct is relevant to job performance. And he wasn't performing the job properly because of his conduct. His conduct, Judge Lowry, was impacted dramatically by the... and his fear of reprisal from the management and his distrust of other employees. And that caused PTSD. And then you would imagine that that would cause you to be a less than stellar worker. And then it would also prompt maybe an AJ to ask, or actually the leadership at the hospital to ask, what can we do here to make this employee a better employee? What responsibility do we have? I understand what you're saying. What argument was made below? I didn't see a lot of evidence in the record before me about any sort of showing that was made that there's some alternative available to removal that would both... something of a lesser penalty that would satisfy also the need to keep the other employees at the VA safe, feeling safe. And so I didn't see any evidence, for example, that he could maintain his job and continue to do his job while working from home or anything like that. I didn't see that kind of finding. Was something like that made? No, Judge Stoll. And I think what I'm... if I hear your question correctly, what I'm thinking is the agency made no effort to find out the source of his problem or ask him the source of his problem. He was never interviewed about these incidents. He was never questioned, like, what is your state right now? Why are you acting like this? They never asked what they could do to help him at all, like, for instance, an employee assistance program or even in the worst case scenario, a psychiatric examination. There was never any effort to help him be a good employee. And there was... he did have, Judge Stoll, he did have a request for a worker's comp disability, which actually got contravened by the agency, and that's not in the record here on appeal. He also had a... the A.J. alludes to him. He had put in for a disability retirement, and after much, much going around, he did eventually get that. But there was never a referral to employee assistance. There was never a questioning of him about what can management do to support this man who's obviously in this amazing amount of distress. And, of course, it was masking what the source of the distress was at the same time. Was there testimony from Dr. Ballantyne or otherwise about whether... I'm not quite sure how to put this, whether the PTSD was moving in a favorable direction so that past conduct that might have been attributable to it might not be expected to be repeated in the future? Thank you for that question, Judge Taranto. As a matter of fact, PTSD, one of the advanced therapies is EMDR, but you have to get the patient stable to some extent, and she did testify that she wanted to move on to EMDR to address his PTSD, but she never could because every time he went back to the hospital, he would get re-triggered, and he would ratchet up again, and he would have to... and so she didn't get to that point. The other thing that she described it as in the testimony, Your Honor, was she testified that it was static or stable in that it wasn't getting better, and that was the illusion she was making when she testified in that way, that it wasn't... There was room. She wanted to make improvements with him, and she had made improvements with him, but he kept on getting re-triggered. So the symptoms that Dr. Ballantyne testified to about PTSD include hypervigilance and re-experiencing the trauma. Those are PTSD things, and irritability, and she testified directly about how that fits into his conduct. For instance, when he asked that he wanted to be addressed by his first name, that would have been a situation perhaps a symptom of hypervigilance, or when he asked rhetorically, What do I have to do to get management's attention here? That might have been a re-experiencing of the trauma and feeling endangered, which Mr. Higgins alluded to in the testimony himself that it was happening to him right there at the trial as he was testifying. So the A.J. ignored all of that, that discussion, and then he did no analysis of the PTSD, and he simply adopted Mr. Dunning's... He parroted Mr. Dunning's aphorism that Mr. Higgins is responsible for the words he spoke, and that gives a little indication of there's no discretion anymore. There's no mitigation possible if you're responsible for the words you spoke, and this was despite hearing the testimony. I'll tell you, I'll let the court know that Ms. Grimes also described Mr. Higgins as being in a psychiatric episode during the EEO office affair, and this was despite Mr. Reisman in the Douglas factors putting in the effect of the symptoms as well, say listing, ongoing work tension, conflict with management, perceived mistrust and anger with senior leadership. So there were all of these flags and no allusion to it, and this is contrary to this court's rulings in Malloy and Bowell. This court chastised the A.J. in Malloy for only having reviewed the voluminous medical evidence, which we believe we have here, and then in Bowell, this court chastised the board's ruling as being devoid of any substantive discussion of the medical evidence. Can I move you on just one quick question before you go into your rebuttal time? You also argue that the board erred in excluding the testimony of Mr. Reisman. I was looking at the proffer testimony of Reisman, which is on pages 20 and 21 of your blue brief, and I don't see something expressed there saying that he was going to talk about institutional motive. Can you identify for me where you think that is in this paragraph? Well, thank you, Judge Stoll. The thing where we have in the proffer there is the connection to the four employees at the bottom, Ambrose, Bomber, Good and Fan, who were all, and we say in the proffer there, that he knew that all four of them had filed adverse reports against Mr. Higgins prior, and yet he used those four to influence and shape his removal decision. And then at the very top of that section is where he talks about, where we made an allusion to Ms. Depperman, his boss, the deputy director of the facility at the time, and her influence on him is laid out there, as she had talked to him about the problems he had with the whole organization. And later on, we proffered our exhibit Triple X, which is also in the appendix there at page 88, where she pressured him to falsify, Ms. Depperman, the deputy director and his boss, to falsify a report of contact because it was going to make her and the director, Mr. Belmont, happy. They had lost trust in him if he didn't change this report of contact to allege that Mr. Higgins had sworn, had used profanity in this interaction, and that attached Triple X, the Reisman report of contact, where he then, and attached that, you know, assembled that along with his proffered testimony, and the picture has been built there of the institutional motive to retaliate. Counsel, you're well into your rebuttal time. You can continue or save it. I'll stay here. The second issue is the AJA's restriction of the evidence of motive. It's your choice, sort of. Ms. Akers. May it please the Court. I'll first address Mr. Higgins' claim that the agency's penalty of removal was unreasonable. The only requirement of an administrative judge when it's reviewing the agency's penalty of removal is to give weight and consideration to all of the Douglas factors. So Mr. Higgins takes concern with factor number 11, the mitigating circumstances, and whether the administrative judge considered the PTSD. But the administrative judge gave the PTSD weight. He said, on balance, I'm balancing the egregious and profane conduct against the PTSD and other mitigating factors. Does he actually say that? On balance, I'm weighing this against that. I'll point you to, Your Honor, Appendix 25, which you had already referenced, as well as Appendix 27, and he is crediting Mr. Dunning, the deciding official's testimony. Mr. Dunning's testimony, you can see it on pages, I believe, 139 to 141, 241 to 243 of the appendix. And he did that balancing consideration, and then the administrative judge found him credible and said, I agree with Mr. Dunning. And so under Malloy, the only thing that's required is weight and consideration. There's no requirement, as Mr. Higgins argues, the administrative judge needs to do this extensive analysis of the medical conditions. And the distinction between Malloy and the Bow case that Mr. Higgins cites is that in both of those cases, there was a substantiated mental impairment. It happened to be depression in both of those cases. And the administrative judge did not consider the mental impairment as a mitigating factor in either of those cases. Exactly. It gave it no weight at all and said, I'm not considering this. I don't find it credible. In both of those cases, this court then came and said, when there's a mental impairment that's substantiated, you have to give it weight and consideration. It then went on to say that if you're not going to, then you need to provide some analysis as to why you think the mental impairment shouldn't be considered mitigating. And that's different from here because the administrative judge here did credit Mr. Higgins' mental impairment, his PTSD, as a mitigating factor. And when he weighed them, he said that he was left with a firm conviction that because of Mr. Higgins' egregiously disruptive and profane conduct on balance, or when he was weighing the two, he thought that the agency's penalty of removal was within the bounds of reason. And that's exactly what's required under Douglas is this balancing factor. And so Mr. Higgins' next argument goes to... Can I just ask this? It seems to me that the PTSD, at least in the abstract, could play two different roles here. One is a role in assessing the word blameworthiness or something comes to mind. Debris of responsibility, I think that was a word. And I think your position is Mr. Dunning and the AJ considered that and decided, even if he wasn't as blameworthy as somebody without that condition, the conduct nevertheless is something we don't need to live with. Another possibility, which I think I asked your opposing counsel about, is that perhaps there could be evidence that the PTSD is under control, moving in a good direction. And so for a forward-looking question of whether we can expect this in the future, the evidence might suggest, in the abstract evidence on the subject, might suggest that removal is an unnecessary penalty. But I think I heard the answer to my question that the latter sort of evidence is not in this case. And indeed, the medical evidence or psychological evidence is that things were not looking better. That's correct, Your Honor. And what is in the record is not so much as Mr. Higgins was improving or his conduct in the workplace was getting better. What the agency considered, and the administrative judge mentioned, was that Mr. Higgins has had an extensive history of misconduct. The agency considered two prior suspensions that he had, and then there was a suspension in this case, and then the removal was based on three separate incidents. So are you suggesting that those prior incidents were also part of the cause by PTSD? I was just wondering how this tied into the PTSD discussion. That was not part of the record, Your Honor, whether those prior incidents, and they were years before. But the agency did consider the history of misconduct when it was doing the balancing under the Douglas factors, and the administrative judge found that that history of misconduct was relevant. But what about the question about are you aware of anything in the record that would show that the PTSD was progressing in a positive direction? In other words, that he was receiving treatment and getting better, or is there evidence that it was not getting better? Is there anything in the record to that effect? No, Your Honor. Dr. Ballantyne did testify, Mr. Higgins' doctor, and she did not testify as to positive work towards the PTSD or any significance as far as whether it was getting better or being remediated in any way. Rather, she did testify that the PTSD may have or could have caused Mr. Higgins to have these outbursts. But again, that just goes to Douglas factor number 11, and that's part of the weighing and balancing consideration, and the administrative judge did take that into consideration, which is all that's required. Did Mr. Higgins at any point argue that one alternative to removal here would be, you know, changing the workplace conditions for him, for example? Perhaps his position would have allowed him to work from home or something to this effect, where he could have performed his duties but at the same time, you know, have been able to not be triggered and not have these workplace problems and be able to seek treatment. There's nothing in the record to that effect, Your Honor. There was some testimony about a previous request of Mr. Higgins to telework on a permanent basis, but that wasn't put forth to the agency as part of this removal procedure. Mr. Higgins was accommodated. There's some reference in the AHA's opinion about that. Correct. And yeah, he did request that, and Dr. Ballantyne did testify to that. He was accommodated by the agency, though. He had a separate workspace, and he didn't have interaction to the level that he used to. So the agency did take measures to accommodate. But what it comes down to for this court is whether the administrative judge gave consideration and weight to all of the Douglas factors. On pages 25 through 27, the administrative judge did just that. So I'll move now to Mr. Higgins' next argument, that the administrative judge abused his discretion in his exclusion of certain witnesses and in his consideration of the evidence. And Mr. Higgins takes concern with CAR Factor 2 under his whistleblower retaliation claim, affirmative defense, excuse me, and says that the administrative judge didn't properly consider motive to retaliate. Mr. Higgins' claims as it goes to institutional motive to retaliate are really of no concern for this court because the administrative judge did credit a possible motive to retaliate. So he did note that there might be some institutional motive to retaliate, given Mr. Higgins' long history of his whistleblowing. So the administrative judge considered that. As it relates to personal motive to retaliate, the administrative judge heard no testimony. There's nothing cited by Mr. Higgins in his appellate brief, any testimony suggesting that any of the witnesses had any personal motive to retaliate. And in fact— What about his argument that had Mr. Reisman been able to testify, he would have talked about how he received input from other people who might have had personal motive to retaliate? Well, I think, Your Honor, that goes to your question that you posed earlier, which is that it has to be in his proffer initially. And so Mr. Higgins' claim is that Mr. Reisman had this motive to retaliate from someone else, and that carried through to the deciding official. His proffer says that he relied on reports from a number of witnesses. He didn't seek to call any of those witnesses at the trial. And those reports that he relied on were in the record. And so presumably any motive to retaliate that would have come from those reports could have been addressed by the witnesses who made the reports, had he chose to call them, or when they were testified to at the hearing, Mr. Higgins could have asked those questions. And now— What was the reason that the A.J. gave for excluding Mr. Reisman's testimony? Redundant or irrelevant. That's what he said for the list of witnesses who he excluded. What do you think it was redundant of? Well, Your Honor, Mr. Reisman was merely going to testify— We can look—I believe it's on page 77 of the administrative record. He was going to testify to a number of things, including the problems that Mr. Higgins had with the whole organization. There were a number of witnesses who talked about those problems. The administrative judge admitted that—or spoke about Mr. Higgins' long history of whistleblowing and said, I'm crediting that. You don't need to put on a bunch of evidence about that. These reports, the agency called these witnesses to actually testify, and so for Mr. Reisman to testify about the reports that the actual witnesses were testifying to seems redundant. And then he said that he can testify about Mr. Poindexter using profane language. The administrative judge noted that in his order and said, I realize Mr. Poindexter also might have used profane language, but that doesn't excuse Mr. Higgins' conduct. Did Mr. Higgins call 11 witnesses? Mr. Higgins called, I believe, 15 witnesses and was permitted to call at the hearing 11. 11. Correct. And so he was able to call a number of these witnesses. And what's important to note for Mr. Reisman here is even Mr. Higgins states in his brief that Mr. Reisman could credibly deny any animus towards Mr. Higgins. So the argument is that he would say that he received reports, but the others who gave him input had a personal motive. So it's a cat's paw theory in that we're imputing this motive to retaliate, but contrary to the typical cat's paw theory, which is that one person has a motive to retaliate and influenced the decision maker to make a certain action, Mr. Higgins' theory is there were a number of people with motive to retaliate who then influenced the proposing official, who then influenced the deciding official. And this cat's paw theory is approximate cause analysis. And Mr. Higgins has not connected Ms. Depperman, Mr. Ambrose, all of these people who wrote these reports to Mr. Reisman, nor has he connected Mr. Reisman to Mr. Dunning, the actual deciding official. And what's also important to note in this chain is Mr. Dunning, who was the deciding official, undertook his own analysis. He heard from Mr. Higgins first before he considered any of Mr. Reisman's Douglas factor analysis. He heard from Mr. Higgins, then he looked through the evidence file, and he also considered Mr. Reisman's Douglas factor analysis. So he did a holistic consideration, an independent consideration, and ultimately determined that based on the conduct that was largely admitted by Mr. Higgins, all of that conduct... When you're referring to that, are you referring to his analysis at page JA114? That's the one paragraph where he explained his reasoning for the removal? Yes, Your Honor, but he also has further testimony that's in the record explaining what he went through. He said that he talked with Mr. Higgins and allowed him an oral reply. He went into the decision with an open mind, so he didn't hear from any of the agency witnesses first. He first heard from Mr. Higgins. He said he considered a comprehensive evidence packet that wasn't put together by Mr. Reisman, and then he considered what Your Honor just cited, Mr. Reisman's Douglas factor analysis. So Mr. Dunning did undertake his own analysis here, and even if all of these other witnesses, two times removed, had some motive to retaliate, they were never elicited at the hearing, and Mr. Higgins has not shown that that motive to retaliate can be imputed to the proposing official and then imputed to the deciding official. And in fact, Mr. Higgins has cited no authority, no cat's paw cases, where there has been this chain of imputing motive to retaliate. So if Your Honors have no further questions, we'll ask that the court affirm the administrative judge's findings. Thank you. Thank you, counsel. Mr. Woody has almost two minutes for rebuttal. Your Honors, just a correction that Mr. Higgins did have all uniformly good performance reviews prior to the termination. He was a good employee, and Dr. Ballantyne did testify that he had the ability to improve, and in fact, in just the year that she'd been working with him, he had made improvements. It all fell off the wagon there towards the end of 2016. What pages are you citing to further contention that he was improved? Well, Dr. Ballantyne's letter on page 101, Judge Stoll, does say that at the very bottom, outside of therapy, Mr. Higgins has willingly used coping skills discussed in this session. That's one of the places where she alludes to that right there. And going back to Judge Stoll's earlier question about telework, he had been offered telework, and he could have done his job via telework as well. He had worked to get, there had been a discussion about telework. The person who could have testified about institutional retaliatory motive was Reisman. He was the one at the focal point of taking in all of these other witnesses' statements and synergizing it into the proposal for removal and the Douglas factor analysis. So to call the other witnesses who would have likely denied any retaliatory animus, there's those in management who know to deny that, and then there's those others outside the system who will simply tell the truth about what was going on. And that was, in fact, what Mr. Reisman was prepared to do. And so to ask Mr. Ambrose or ask Goody or Balmer to testify about retaliatory animus, it was the person who could talk about it was Reisman, and he was excluded. And that was an abuse of discretion at that point right there. Mr. Dunnings, finally, if I see I'm out of time, Your Honor, if I can finish my last point. Mr. Dunnings' removal file was tainted by the fraudulent order of protection that was in there and also by all of the lengthy listing of the police reports that had been made against Mr. Higgins. So Mr. Dunnings' mind was not clear when he reviewed the performance file. And so we ask that the case be remanded to reopen the record. Thank you, Mr. Witte. We have your case. The case will be taken under advisement.